IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 21, 2022

## DONALD J. VAUGHN v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2009-C-2285     Mark J. Fishburn, Judge**

---

### No. M2021-01180-CCA-R3-PC

---

The petitioner, Donald J. Vaughn, appeals the denial of his petition for post-conviction relief, which petition challenged his guilty-pleaded convictions of aggravated rape, alleging that his guilty pleas were invalid because he was deprived of the effective assistance of counsel. Because the issue was previously determined, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, and J. ROSS DYER, JJ., joined.

Ryan C. Caldwell, Nashville, Tennessee, for the appellant, Donald J. Vaughn.

Herbert H. Slatery III, Attorney General and Reporter; Richard D. Douglas, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Janice Norman, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

In July 2009, the petitioner was charged with one count of aggravated kidnapping and two counts of aggravated rape of the victim. *State v. Donald Vaughn*, No. M2011-00937-CCA-R3-CD, 2013 WL 1461774, at *1 (Tenn. Crim. App., Knoxville, Apr. 11, 2013). The petitioner's case went to trial, but after jury selection began, the petitioner "entered into a plea agreement with the State," and the petitioner pleaded "guilty to two counts of aggravated rape with his sentence to be determined by the trial court in exchange for dismissal of the aggravated kidnapping charge." *Id.* On direct appeal, this court recited the facts as presented by the State during the petitioner's plea submission hearing:

On October 31, 2008, the victim was on her way to a Halloween party when she noticed the [petitioner] following her in a white Jeep. The victim repeatedly tried to get away from the [petitioner], and only left her car after she believed he was no longer following her. After exiting her car, the victim saw the [petitioner] standing across the street from her. The victim demanded to know why the [petitioner] was following her. The [petitioner] rushed the victim, grabbed her, and drug her across the road and into some bushes.

According to the State, the [petitioner] then placed his hand over the victim's mouth and told her to "shut the f--k up" or he would kill her. As the victim struggled and attempted to scream, the [petitioner] licked and kissed her neck and breasts. The [petitioner] pried the victim's thighs open, ripped her underwear off, and digitally penetrated her vagina. After digitally penetrating the victim, the [petitioner] unbuckled his pants and penetrated the victim's vagina with his penis. After several minutes, the [petitioner] fled, and the victim was able to flag down a motorist and call 911.

The State further presented that during the rape, the victim suffered "a busted lip," a bruise on her arm, and scratches on her right hip and inner thighs. The [petitioner's] DNA was found on the victim's neck and breasts, as well as on a semen stain on the victim's dress. Semen recovered from the victim's vagina was also found to be a partial match to the [petitioner's] DNA.

*Id.* at *1-2. Before a sentencing hearing was held, the petitioner "fired his appointed counsel and retained a different attorney to represent him" and "filed a motion to withdraw his guilty pleas." *Id.* at *2. At the hearing on the petitioner's motion to withdraw his guilty pleas:

[T]he [petitioner] testified that his [trial] counsel failed to me[e]t with him and failed to properly prepare to try his case. The [petitioner] testified that he repeatedly wrote letters to the trial court and the Board of Professional Responsibility complaining about his attorney's lack of representation. The [petitioner] claimed that as a result of his actions, his [trial] counsel repeatedly belittled, ridiculed, mocked, and cursed

-2-

him, and warned him that "when you f--k with an attorney, you're going to get hung."

The [petitioner] claimed that he did not want to plead guilty but felt he had no choice but to do so after jury selection had started. According to the [petitioner], his attorney failed to challenge any of the potential jurors and laughed at him while pointing out potential jurors who were going to "hang" him. The [petitioner] claimed that the day jury selection began in his trial, his [trial] counsel yelled at him and berated him into accepting the plea agreement. The [petitioner] testified that he just became "a machine" and signed the plea agreement and answered "yes" to whatever he was asked in order to "get it over with." The [petitioner] claimed that he went into a "shock" that lasted the next four days and he could not remember what happened during that time.

The [petitioner] admitted on cross-examination that he had previously pled guilty to a felony and had gone through the plea submission process prior to his pleas in this case. The [petitioner] also admitted that immediately after he entered his pleas in this case, he called his brother and told him that he had decided to plead guilty because the Holy Spirit had moved him and God had told him to plead guilty. The [petitioner] also told his brother that he decided to plead guilty because there were too many women in the jury pool and he believed that there was some sort of conspiracy to place acquaintances of the victim and people familiar with his case on the jury.

The [petitioner's] mother testified that she overheard the [petitioner's] attorney berate him during jury selection. She also testified that the [petitioner's] attorney approached her and asked her to convince the [petitioner] to plead guilty. She claimed that after she refused to do so, the [petitioner's] attorney locked her in a conference room in the courthouse while the [petitioner] plead[ed] guilty. The trial court subsequently denied the [petitioner's] motion to withdraw his guilty pleas.

*Id.* After a sentencing hearing, the trial court sentenced the petitioner to an effective sentence of 48 years' incarceration to be served at 100 percent release eligibility. *Id.* at *4.

-3-

The petitioner appealed the denial of his motion to withdraw his guilty pleas, arguing that "the State failed to prove that the [petitioner] inflicted a bodily injury to the victim." *Id.* In affirming the validity of the petitioner's guilty pleas, this court concluded that "[a] bodily injury was clearly established by the factual basis for the [petitioner's] guilty pleas provided by the State and the victim's testimony at the sentencing hearing." *Id.* at *5.

The petitioner filed a timely pro se petition for post-conviction relief, and with the assistance of counsel, filed an amended petition, alleging ineffective assistance of trial and appellate counsel. After the withdrawal of counsel, the post-conviction court appointed substitute counsel, and the petitioner filed a second amended post-conviction petition.

At the May 2021 evidentiary hearing, the petitioner testified that trial counsel represented him for approximately a year and a half leading up to his trial and that he was in custody during that time. He said that he "filed a complaint" against counsel "because he wouldn't respond to my letters or my family's inquiries," after which, counsel "arrived to the facility . . . and told me that he had everything under control." During counsel's one visit to the jail, the petitioner asked him whether the State made a plea offer, and counsel told him "they were offering two eights," but the petitioner "didn't know what for or how they would be structured." The petitioner said that trial counsel moved for a reduction in bond at the petitioner's request and that, at the motion hearing, counsel told the petitioner, "I'm going to show you what happens when you f*** with an attorney, . . . you don't file complaints against me, . . . I'm going to show you what happens now." The petitioner said that "from that point forward, there was no communication regarding my charges, or strategy, or anything. It was basically him aggressively calling me names, belittling me, telling me I was going to spend my life in prison and that he was going to make sure I got [75] years." The petitioner said that trial counsel failed to explain the elements of aggravated rape or "anything regarding charges, or sentencing, or anything like that."

The petitioner denied that trial counsel reviewed any discovery materials with him but acknowledged that he "received partial discovery" in the mail. He said that when he was in the "holding area" at the courthouse for status hearings, trial counsel "would briefly walk through that holding area, and he wouldn't stop, or talk to me, or communicate with me." During one meeting with counsel in "the booth," approximately two weeks before the scheduled trial, counsel showed the petitioner "pictures of bite-mark injuries" to the victim and said, "[T]his is what you did. . . . [W]e're going to use this, we're going to hang your ass." When the petitioner told counsel "I didn't do that," counsel "snatched [the photographs] away from me and he walked out of the holding cell."

-4-

The petitioner described trial counsel's behavior toward him as "absolutely abusive," "threatening," and "very aggressive." He said that in a hearing on a motion for new counsel, he told the trial court that counsel had made one 15-minute visit two days prior to the hearing and "was just yelling at me." During that hearing, counsel acknowledged to the trial court that he called the petitioner "a rapist after [h]e called me a fat slob." The petitioner said that he filed "several" complaints against trial counsel with the Board of Professional Responsibility ("the Board"). In one complaint, dated July 11, 2010, the petitioner told the Board that before a July 6, 2010 bond reduction hearing, trial counsel

> "took me into a private visiting booth and told me 'I'm gonna show you what happens when you F*** with an attorney.' He informed me that I made a big mistake by writing to the Board . . . . He also told me 'I'm not interested in representing you and I really don't care for you.' He also informed me that he would not be working for me. He said he would do whatever he wanted to do in my case from now on.
>
> Needless to say, my hearing didn't go well. I am facing a lot of time and I am honestly afraid of what he's gonna do. I need someone who will represent me seriously in this matter.
>
> He has acted very unprofessional and broken several rules of pro[fessional] conduct. Please advise me on what to do."

The petitioner noted that trial counsel had been publicly censured by the Board "for aggressive and abusive behavior towards another attorney."

The petitioner said that trial counsel failed to investigate potentially exculpatory evidence, explaining that the victim's "medical report says that there were no injuries . . . that were seen during the examination," "[t]he witnesses who were there that night said there were no injuries," "the police said that there were no injuries," and photographs taken by the detectives of the victim's arms and neck showed that "[t]here were no injuries" but that "a couple of weeks later, pictures surfaced of bite marks." The petitioner said that he "contacted an odontologist in Nashville and one in Birmingham," both of whom said "that there's no way that bite marks appear later, that they would have been present at the medical examination" but that counsel failed to investigate the matter. He also said that "on the Thursday status hearing before trial," counsel "told the [c]ourt that he was ready for trial. But then the next day, he filed a motion for funds for a DNA

expert." "So I don't know why he would have told the [c]ourt that he was ready for trial when he wasn't, obviously."

The petitioner said that on the day of trial, "[trial counsel] told me that, if I didn't plead guilty, he was going to make sure I got [75] years." The petitioner said that during jury selection, he became concerned because of "overwhelming statements being made." As an example, the petitioner said that the victim's "college professor was in the jury pool, and . . . he stood up and said that [the victim] had visited him and told him all about this rape, which I felt would have tainted the whole jury pool." Another potential juror was "a woman who lived in the neighborhood" where the rape occurred and had "started a neighborhood watch because of this incident." Also in the jury venire, "was a lady whose daughter had been raped." Yet another potential juror "said that she had been on a jury before for a rape case and that she felt like justice wasn't served because the rape victim [sic] got off." The petitioner said that he tried "to express my concern to [trial counsel]," but "he just waved me off and was like you have nothing to do with this, this is my decision, I'm going to do what I want to do."

At some point during jury selection, trial counsel "leaned over and he said look, I know we've had problems and I apologize for having problems . . . . but the best thing you could do is just . . . do an open plea." The petitioner said that trial counsel told him, "I know this Judge, he'll give you two [15]-year sentences and he'll run them together," but the petitioner told counsel, "I don't want to do that right now." During a recess, trial counsel "came back there . . . . and he said here, go ahead and sign this open plea." When the petitioner again told counsel that he did not want to plead guilty, counsel "got really aggressive, and mad and started screaming, threw the papers down on the sink in there and said you sign this or I'm going to hang your f***ing a** . . . when we go back in [t]here. You're going to get [75] years." The petitioner said that he "started crying" and "said I don't want to sign this." The petitioner felt that he "was under a lot of pressure at that time. . . . [I]t was terrible" and counsel "wasn't willing to help me. He said that he signed a plea agreement because "I felt like I had no choice. [Trial counsel] was threatening me. He was intimidating me, and he coerced me into signing that by telling me that I would get two [15]-year sentences and they would be run together." The petitioner continued, "And I was only doing it because my alternative was to get [75] years at [100] percent according to my attorney."

The petitioner said that immediately after he entered his guilty plea, he "called my mother's cell phone" and "explained what happened . . . between [trial counsel] and I, and she was upset about it." He said that he also called his brother and told him that he signed the plea agreement because "I was being responsible. I felt like I was culpable for wrongdoing that night. I was absolutely not culpable for two aggravated rapes, but I

signed this plea thinking that it was the best alternative because that's what [trial counsel] told me to do."

During cross-examination, the petitioner said that if trial counsel had investigated the victim's bite mark injuries, "I would have had a reasonable defense because the bite mark photograph was "refuted . . . [by] all of the medical, eye-witness and police reports." He also said that trial counsel "told me that I had no defense. He told me that he wouldn't work on one either. He said he wasn't going to help me anymore."

The petitioner explained that when he told his brother that he was "culpable for wrongdoing," he "was referring to my lifestyle that was an ongoing conversation that we had been having for years." "I never said I was guilty of rape, never." The petitioner said that trial counsel originally presented him with a plea offer of two eight-year sentences and that he asked counsel to "ask about getting those ran together" but that he did not see counsel again "for about a year," at which point "it had changed to a [20]-year offer." He reiterated that he wanted to go to trial and that if counsel "would have investigated the case, explained the consequences of pleading guilty and not have coerced me into pleading," he would not have pleaded guilty. He said that he felt that he had no choice but to sign the plea agreement because after he initially "refused to sign it," counsel "got angry and started saying all kinds of negative things to me," including that if he did not sign the plea agreement, "you're going to get [75] years." He insisted that he signed the plea agreement believing that he would receive two concurrent 15-year sentences. He acknowledged, however that in one conversation, he told his brother that each conviction carried a 15- to 25-year sentence and that the sentences could be aligned concurrently.

Brandy Vaughn, the petitioner's brother, testified that he talked with the petitioner after the plea submission hearing and said that the petitioner "was never happy with the . . . circumstances of his attorney and all that." The petitioner complained of "[b]ad treatment" by trial counsel, and Mr. Vaughn "wasn't really . . . happy with" trial counsel either, but "with the cost of attorneys at the time, I wasn't available to . . . do anything about it." Mr. Vaughn acknowledged that he never met trial counsel but said that the petitioner told him that counsel had repeatedly been verbally abusive both before and after the plea submission hearing. Mr. Vaughn denied that the petitioner ever admitted to raping the victim and said that their conversation was "about [the petitioner's] being in the wrong place at the wrong time." He said that he encouraged the petitioner to "take responsibility" for "whatever your part was" but said that "to this day," the petitioner never admitted guilt.

Kathy Clark, the petitioner's mother, testified that she came to every court appearance in the petitioner's case and "spoke with many of the lawyers." She said, however, that she "tried and tried to reach [trial counsel] to no avail. [Trial counsel] would

not call me back." She said she tried to call trial counsel on the petitioner's behalf because the petitioner "wasn't getting anywhere" and that counsel "would not return calls." She recalled that she and the petitioner were particularly concerned about counsel's representation "because [the petitioner] had not even spent time with [trial counsel]" and said that the petitioner asked, "[H]ow can he represent someone if he's not even talked to them."

Ms. Clark said that during jury selection, she was seated in the gallery behind counsel's table, and the petitioner "sent me a note saying that [trial counsel] wanted him to take a plea deal. [The petitioner] did not understand exactly what that was. He was asking mine and my mother's opinion. He didn't know what to do." Ms. Clark and her mother "talked for a second. She said absolutely not, let them pick the [j]ury." Ms. Clark gave a note to the court officer to deliver to the petitioner, advising him to go forward with trial, and "when [trial counsel] looked at it, . . . he slammed it down and slung it across the table." The court took a recess "within a few minutes of that," during which time Ms. Clark went to get a cup of coffee and overheard "some of the [j]urors talking about the case." She "rushed back" and told trial counsel, "[T]hey're talking about my son's case down in the cafeteria," and counsel said "it doesn't matter anymore, he pled." Ms. Clark said that she "was very upset" and that "everyone in the family was upset because this is not what we had thought was going to happen." She said that the petitioner called her a short time later and told her that counsel "took him back, started screaming at him and told him, if he did not sign a plea agreement, he would see that he got [75] years."

Ms. Clark also said that after the petitioner entered his plea, she told trial counsel that she needed to retrieve the petitioner's suit and tie that he had been wearing and that trial counsel "showed me and my sister-in-law to a room, told us to wait there." "He had us locked in this room. We couldn't even get out of this room until he came and let us out of the room with the clothing in hand." When "I asked him what was going on," trial counsel "said it doesn't matter, and he turns around and walks away."

During cross-examination, Ms. Clark testified that after the petitioner pleaded guilty, trial counsel told the media that "the only reason my son did the plea agreement was because his mother was in the courtroom." Ms. Clark said that she and the petitioner "don't have anything to hide from each other" and that "[h]e did not have to plead over what I might hear in the courtroom" but that "that's just the type of thing [trial counsel] was doing to my son, and to myself and to anyone else involved. He didn't have time to do anything for anybody." Ms. Clark said that during one visit with the petitioner, she told him, "I'm going to love you no matter what. If you did this, okay, we'll deal with it." The petitioner told Ms. Clark that he and the victim "were having sex" when "her boyfriend pulled up, and then that's when she started wanting to holler rape." She also said that the victim told a couple who had stopped to help her that her attackers had left in

a "little dark car" but that the petitioner "was in a huge white Jeep" at the time. She said that she was unable to relay this information to trial counsel because he "would never call me back. I couldn't tell him anything."

Upon questioning by the court, Ms. Clark said that on the night of the rape, the petitioner had driven to the Gulch for a party with some friends and that "a couple" rode with the petitioner. The petitioner told her that he and the victim "started making out, they were in the car, started making out and . . . one thing led to another until her boyfriend showed up." She reiterated that she never got an opportunity to relay this information to trial counsel because he would not return her telephone calls.

Trial counsel testified that he met with the petitioner leading up to the trial date but could not remember how many times. He said that they "had a court date usually every . . . three weeks" and that he "met with [the petitioner] in court. Then, you know, in jail." He said that he "briefly" reviewed discovery materials in preparation for trial. He said that he tried to discuss a defense strategy with the petitioner but that the petitioner was "insistent that he wanted a particular amount of years," specifically, "he wanted an eight-year sentence" with a 30 percent release eligibility and "felt that was a fair resolution to the matter." Trial counsel said that he relayed to the State that the petitioner was willing to plead guilty for an eight-year sentence but that the State refused to negotiate for a sentence less than 20 years. He said that the State never offered nor entertained an offer with an eight-year sentence and that the petitioner never indicated prior to trial that he was willing to plead guilty for a 20-year sentence.

Trial counsel said that he showed the petitioner photographs of the victim's injuries and the Tennessee Pattern Jury Instructions and explained to the petitioner that aggravated rape could be established by the victim's suffering bruising. He said that the photographs showed where the victim's "ribs were all bruised all the way from like her hip up to her side, up close to her shoulder blade." He believed that the petitioner had difficulty understanding that the victim's suffering a bruise could elevate a rape to aggravated rape. He acknowledged that the victim testified at a pretrial hearing that the bruising did not show up immediately but said that it was "like if you were in a car wreck, or you get punched in the eye, . . . and it doesn't show up for a day." In terms of a trial strategy, counsel said that, based on the evidence, he did not believe the petitioner had a valid alibi defense. He secured a DNA expert who "found nothing that would indicate [the State's DNA analysis] was a mistake or . . . a false positive for [the petitioner's] DNA" and determined that calling a DNA expert at trial would bolster the State's case and harm any defense. He also said that the victim's bruising and her "screaming for help on the side of the road" "would negate that . . . this was a consensual situation." Counsel said that he explained all of this to the petitioner.

Trial counsel said that although he was able to communicate with the petitioner, the petitioner "wanted what he wanted. And if you were not able to get him the eight years at [30 percent] offer, he let you know he was not happy about it." He said that the petitioner was polite at times and at other times, "we weren't. It went both ways." "He would often tell me that a big fat guy like me wouldn't know what it was like to have a lot of women and that I couldn't understand all this . . . ."

Trial counsel said that he did not remember "at all" one of the victim's college professors being on the jury. He recalled that one potential juror said that the offenses "happened near my neighborhood" and that she had "organized the neighborhood watch in response to this." At that point, the petitioner "indicated to me, asked if I could go take the [20]." Trial counsel said that he asked the prosecutor whether they would allow the petitioner to plead guilty for a 20-year sentence, but the prosecutor told trial counsel that the petitioner would have to enter an open guilty plea at that point. Counsel said that the petitioner "insisted he wanted to plead guilty" that he was surprised by the petitioner's decision because "he did not want the aggravated rape charge" and was adamant that "this wasn't an aggravated rape," and "it seemed like he was willing to go to trial." Counsel said that during a trial recess, he prepared a plea agreement for two counts of aggravated rape and reviewed the form with the petitioner.

During cross-examination, trial counsel acknowledged that he and the petitioner "always didn't get along" but said, "I'm not a miracle-worker. There's only so much you can do." He acknowledged that on one occasion he told the petitioner, "I might not get a lot of women, but I don't have to rape them." Counsel said that he moved to withdraw from representation but that the trial court denied the motion. Counsel estimated that the petitioner filed "[p]robably three, four" complaints against him with the Board. Counsel said that he "was actually shocked" that the petitioner was considering a guilty plea and that during a recess from jury voir dire, he explained to the petitioner that he would strike the potential juror who had indicated that she lived in the neighborhood where the offenses occurred but that the petitioner believed the entire jury pool to be tainted by the potential juror's statement. Counsel said that the petitioner then said, "[L]et me go for an offer, the twenty-year offer on this case. . . . He wasn't happy about it obviously." Counsel denied that "there was this threatening fight going on" and noted that he wasn't alone with the petitioner, "[t]here were court officers."

In its written order denying post-conviction relief, the post-conviction court found, among other things, that trial counsel had "met with [the p]etitioner both in jail and in the holding cell at court, that the petitioner and trial counsel "quarreled and insulted one another throughout the attorney-client relationship," that "[t]rial counsel provided [the p]etitioner a copy of discovery and reviewed it and the photos" with him, that "[t]rial counsel showed [the p]etitioner photos of the victim's injuries, including bite marks, prior

-10-

to the morning of trial," that the "[p]etitioner rejected the State's pre-trial settlement offer of 20 years because he did not think it was a fair sentence," that "[t]rial counsel showed [the p]etitioner the T.P.I. jury instruction for [a]ggravated [r]ape in an effort to explain why the rape was considered 'aggravated' under the law," that "[t]he bite mark photos were previously addressed in two separate hearings held on October 11, 2018, and November 29, 2018," and that "[t]rial counsel was publicly censured in 2014." The post-conviction court concluded that the petitioner "entered his plea[s] knowingly and voluntarily" and that the petitioner failed to establish that trial counsel performed deficiently.

In this timely appeal, the petitioner argues that trial counsel performed deficiently rendering his guilty plea unknowing and involuntary. Specifically, the petitioner asserts that counsel was "abusive," "failed to communicate" with the petitioner, and "neglected to obtain all of the photographic evidence." The State contends that the petitioner is not entitled to post-conviction relief.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citation omitted), and "[t]he petitioner bears the burden of overcoming this presumption," *id.* (citations omitted). We will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

In the context of a guilty plea, the petitioner must establish that "counsel's constitutionally ineffective performance affected the outcome of the plea process" by establishing "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *see Hicks v. State*, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998).

Apart from whether a guilty plea is the product of ineffective assistance of counsel, it is invalid if otherwise made unknowingly or involuntarily. "Whether a plea was knowing and voluntary is an issue of constitutional dimension because '[t]he due process provision of the federal constitution requires that pleas of guilty be knowing and voluntary.'" *State v. Wilson*, 31 S.W.3d 189, 194 (Tenn. 2000) (alteration in original) (quoting *Johnson v. State*, 834 S.W.2d 922, 923 (Tenn. 1992)). A plea "may not be the product of '[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats." *Wilson*, 31 S.W.3d at 195 (alterations in original) (quoting *Boykin v. Alabama*, 395 U.S. 238, 242-43 (1969)); *see also State v. Mellon*, 118 S.W.3d 340, 345 (Tenn. 2003) (citing *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993)).

The petitioner is not entitled to post-conviction relief. Whether trial counsel performed deficiently so as to render the petitioner's guilty plea unknowing and involuntarily has already been litigated in the motion to withdraw his guilty pleas, the denial of which was affirmed by this court on direct appeal.[1] *See Donald Vaughn*, 2013

---

[1]    In his initial petition, the petitioner raised a claim of ineffective assistance of his post-plea and appellate counsel; however, he presented no evidence on this claim at the evidentiary hearing and does not raise the issue on appeal. Although this issue was not previously determined, the claim is nonetheless waived. *See Horace Johnson v. State*, No. 01C01-9404-CR-00138, 1994 WL 630526, at *3 (Tenn. Crim. App., Nashville, Nov. 10, 1994) (determining post-conviction claims waived because the petitioner "either did not present evidence to support his claims at the hearing on his petition or he has not argued the claim on appeal").

WL 1461774, at *1.  In the context of post-conviction procedures, "[a] ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing."  T.C.A. § 40-30-106(h).

Moreover, the petitioner has failed to establish that he entered his guilty pleas unknowingly or involuntarily.  His signed plea agreement clearly states that he was pleading guilty to two counts of aggravated rape with a sentence range of 15 to 25 years to be served at 100 percent.  It also states that the "length of service [and] consecutive or concurrent sentencing, T.B.D. [at] later sentencing hearing."  Moreover, during the plea submission hearing, the trial court recited the sentencing range for aggravated rape as "between 15 and 60 years" to be served at "100 percent" and told the petitioner that each conviction carried a separate sentence, and the petitioner indicated that he understood.  The trial court also said, "The length of sentence and whether or not the sentences run concurrently or consecutively will be determined at a later date at a separate sentencing hearing," and the petitioner told the court that he understood.  These circumstances establish that the petitioner knew the potential sentencing range and consequences of his guilty pleas.

Moreover, during the plea submission hearing, the trial court, noting that the court had already ruled upon the petitioner's previously-expressed complaints about trial counsel, asked the petitioner whether he had any additional complaints about counsel's representation, and the petitioner responded, "Nothing additional."  The trial court asked the petitioner, "Has anyone threatened you with anything or promised you anything in order to get you to enter these pleas?"  The petitioner answered, "No."  Despite more than one opportunity, the petitioner did not tell the trial court that he felt threatened or coerced by counsel to plead guilty as he now alleges.  Consequently, this issue lacks merit.

Accordingly, the judgment of the post-conviction court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE